IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **PATRICK KING,** | : | **Civil No. 1:15-cv-00159** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **MANSFIELD UNIVERSITY OF** | : | |
| **PENNSYLVANIA;** | : | |
| **THE PENNSYLVANIA STATE** | : | |
| **SYSTEM OF HIGHER** | : | |
| **EDUCATION; JOHN HALSTED;** | : | |
| **CHRISTINE SHEGAN,** | : | |
| | : | |
| **Defendants.** | : | **Judge Sylvia H. Rambo** |

# M E M O R A N D U M

Presently before the court is Defendants' Mansfield University of

Pennsylvania ("Mansfield"), The Pennsylvania State System of Higher Education

("PSSHE"), John Halsted ("Halsted"), and Christine Shegan ("Shegan"),

(collectively, "Defendants")[1] motion for summary judgment as to all claims raised

in Plaintiff Patrick King's ("Plaintiff") amended complaint.  (Doc 27.)  For the

reasons that follow, Defendants' motion will be granted in part and denied in part.

---

[1] Defendants Halstead and Shegan will collectively be referred to as the "Individual Defendants."

# I.  Background

## A. Factual Background

The following facts are not in dispute unless otherwise indicated.  Plaintiff, who identifies as a gay male, enrolled as a student at Mansfield in January 2001. (King Dep. I, p. 135.)  As a student at Mansfield, Plaintiff was involved in student governance and participated in several extracurricular activities.  (*See e.g.*, King Dep. II, pp. 15-18.)  Plaintiff was also employed in a work-study position as a student activities director.  (*Id.* at 9-11.)  In the course of his employment and participation in various extracurricular activities, Plaintiff came into contact with a certain maintenance worker employed by Mansfield, John Estep ("Estep").  The particulars of their various encounters are set forth in Defendant's Statement of Facts and this court's prior opinion (Docs. 21; 42,) and need not be recounted here in detail. Relevantly, in sum, Estep made various and repeated comments of a graphic sexual nature towards Plaintiff, sexually propositioned Plaintiff, and repeatedly touched Plaintiff without consent.  (King Dep. II, pp. 43-84.)  Most notably, Estep crawled into a bathroom stall that was occupied by Plaintiff and, in a separate incident, forcibly grabbed Plaintiff's genitals.  (*Id.*; Doc 47-5, pp. 1-2.)  The harassment occurred intermittently until Estep retired on May 2, 2003.  (Wood Aff., ¶ 2; Attachment A.)  Defendants do not contest that Plaintiff suffers from depression, which Plaintiff asserts was exacerbated by Estep's harassment.

While enrolled at Mansfield, Plaintiff's overall grade point average ("GPA") appeared to vacillate between a 2.3 at its lowest point and a 3.2 at its highest. (King Ex., p. 77.) On December 9, 2003, King submitted a petition to Mansfield requesting permission to take additional courses in the spring semester of 2004. (King Dep. II, p. 134; Ex. 16.) That semester, Plaintiff registered for eight courses for a potential of 24 credits. (King Dep. II, Ex. 8.) He failed three courses but completed the remaining 15 credits with passing grades. (*Id.*)

Although Defendants' statement of material facts is largely devoid of facts relating to Plaintiff's alleged treatment by certain professors, the complaint alleged that Dr. Bruce Carpenter ("Dr. Carpenter") and Dr. Mahmoud Gaballa ("Dr. Gaballa") refused to accommodate his disability. (Doc. 27, ¶ 68.) In the fall semester of 2003, Plaintiff was enrolled in two courses with Dr. Carpenter. (*Id.* at 69.) Plaintiff alleges that Dr. Carpenter refused to allow him to make up classes and assignments despite being presented with doctors' excuses. (*Id.*) Plaintiff complained to Mansfield officials who instructed Dr. Carpenter to accept the excuses; however, he alleges that "by that time Plaintiff was forced to withdraw from those courses." (*Id.* at 70.) In the spring of 2004, Plaintiff took another class with Dr. Carpenter. (*Id.* at 71.) Plaintiff alleges that "Dr. Carpenter would treat him in a rude and hostile manner" and he eventually received a failing grade for the course. (*Id.*) Defendants admit that Plaintiff failed this course but deny that Dr. Carpenter

treated Plaintiff in any negative way or declined to accept his doctors' excuses. (Doc. 32, ¶¶ 70-71.) Plaintiff also alleges that he had a course with Dr. Gaballa in the spring semester of 2004 and that Dr. Gaballa also refused to accept Plaintiff's medical excuses, refused to let Plaintiff make up missed tests and assignments, was "rude" to Plaintiff, once kicked Plaintiff out of class, and gave Plaintiff a failing grade in the course. (Doc. 27, ¶ 72.) Defendants admit only that Dr. Gaballa kicked Plaintiff out of class and gave Plaintiff a failing grade for the course. (Doc. 32, ¶ 72.) Plaintiff alleges that he complained to Mansfield administrators, including Halsted, about Drs. Gaballa and Carpenter, yet his complaints were ignored. (Doc. 27, ¶¶ 74-77.) On May 21, 2004, Plaintiff made a written request that two failing grades received from Drs. Carpenter and Gaballa be changed to "incompletes." (King Dep. II, p. 152, 155; Ex. 24.) A hearing on the request was held on June 9, 2004, which Plaintiff did not attend. (Carpenter Ex. 1; King Dep. II, p. 154-55; Ex. 24). The requested grade change was denied. (*Id.*) Plaintiff claims that he never received notice of the hearing or the final determination, but did not follow up with his request. (King Dep. II, p. 155.) Based on the conduct of his professors and the allegations involving the grade change hearing, Plaintiff asserts that Mansfield as an institution discriminated against him because it failed to accommodate his disability or force its professors to make appropriate accommodations. (*Id.* at 78.)

On April 26, 2004, Plaintiff wrote letters to Governor Edward Rendell and State Representative Matthew Baker, among others, setting forth the problems he had experienced at Mansfield. (King Dep. I, pp. 104-108.) Rep. Baker notified Plaintiff that he forwarded the letter to Halsted. (*Id.* at 109.) On April 30, 2004, and May 3, 2004, Plaintiff wrote letters directly to Halsted that raised issues regarding his professors but mentioned neither Estep nor the sexual harassment.[2] (King Ex. 13.) Halsted sent a response to Plaintiff and referred him to Molly Bailey, the Chief Human Resources Officer and Director of Affirmative Action ("Bailey"). (King Ex. 14.) Plaintiff testified that he spoke to Bailey regarding both his issues with the professors and Estep. (King Dep. II, p. 88.) At the end of April or the beginning of May 2004, Plaintiff reported Estep's misconduct to campus police. (*Id.* at 97-99.)

**B. Procedural History**

On September 15, 2004, Plaintiff filed a complaint with the Pennsylvania Human Relations Commission ("PHRC") alleging that Mansfield failed to adequately accommodate his depression, which stemmed from Estep's continuous harassment. (*See* King Dep. I; *see also King v. Mansfield Univ. of Pa.*, No. 11-cv-

---

[2] Plaintiff's letter dated April 30, 2003, may have enclosed letters sent to Rep. Baker and others. It is unclear exactly which letters were included; however, a letter from Dr. Halsted notes that "several others [sic] letters dated April 26 and 28" were received by his office. (King, Ex. 14.) The letter dated April 26, 2003, included information about Estep's conduct. (King, Ex. 11.)

1112, 2014 WL 3734551, *6 (M.D. Pa. July 28, 2014) ("*Mansfield I*").[3]) Plaintiff dual-filed the PHRC complaint with the United States Equal Employment Opportunity Commission ("EEOC"). (*Id.*) On May 16, 2005, Plaintiff amended his PHRC complaint to include allegations of Estep's sexual harassment.[4] (*Id.*) On August 12, 2010, the PHRC dismissed Plaintiff's discrimination claims. (*Id.*) On March 8, 2011, the EEOC sent Plaintiff a "right to sue" letter after it adopted the PHRC's findings. (*Id.*)

On December 24, 2014, Plaintiff filed a complaint in the Dauphin County Court of Common Pleas against Defendants, alleging violations of his rights under the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. C.S. § 951, *et seq.*, (Count I), the Pennsylvania Fair Educational Opportunities Act ("PFEOA"), 24 P.S. §§ 5001-5010, for a hostile educational environment (Count II), the PFEOA for a failure to accommodate a disability (Count III), the PFEOA for a hostile educational

---

[3] This is not the first time that Plaintiff has attempted to litigate his claims in federal court. In *Mansfield I*, Plaintiff raised claims based on the same factual background discussed *infra*, raising claims under Title VII of the Civil Rights Act of 1964, Title II of the Americans with Disabilities Act of 1990, Section 504 of the Rehabilitation Act of 1973, the PFEOA, and the PHRA. This court dismissed Plaintiff's federal claims on statute of limitations grounds and declined to exercise jurisdiction over the pendent state law claims. Thus, the court granted summary judgment in favor of Defendants and dismissed the remaining state law claims pursuant to 28 U.S.C. § 1367(c)(3). *Mansfield I* at 16.

[4] This court previously held that the May 13, 2005 charge did not relate back to the September 15, 2004 charge and, thus, the charge alleging sexual harassment was untimely. *Mansfield I*, at 10 ("[The September 15, 2004] amendments were far more substantive than merely cures to technical defects. This was an entirely new and distinct claim, which is beyond the type of amendments that relate back to the original complaint.") (citing *Hornsby v. Conoco Inc.*, 777 F.2d 243, 247 (5th Cir. 1985)).

6

environment (Count IV), and his equal protection rights under Section 1983, 42 U.S.C. § 1983 (Count V).[5]  On January 23, 2015, Defendants removed the action to federal court.  (Doc. 1.)  On August 5, 2015, the court denied Plaintiff's motion to remand back to state court.  (Doc. 12.)  On September 5, 2017, Plaintiff filed a motion for partial summary judgment on Defendants' affirmative defense of the statute of limitations.  (Docs. 24-25.)  Two weeks later, on September 19, 2017, Plaintiff filed an amended complaint, raising substantially the same claims as in his original complaint.  (Doc. 27.)[6]  Accordingly, this court dismissed Plaintiff's motion for partial summary judgment as moot yet allowed Defendants to renew their affirmative defense after responding to the amended complaint.   (Doc. 36.) Defendants did so, filing the instant motion for summary judgment on July 2, 2018. (Doc. 38.)   Plaintiff filed a response on July 30, 2018, and Defendants submitted their reply brief on August 24, 2018.  (Docs. 47, 53.)  Therefore, the matter has now been fully briefed and is ripe for disposition.

---

[5] In his original complaint, Plaintiff also claimed that Mansfield, PASSHE, and Shegan violated Pennsylvania's Criminal History Record Information Act ("CHRIA") by failing to record Plaintiff's complaints.  This court granted judgment on the pleadings as to Count VI, however, because Plaintiff has failed to state a claim under CHRIA.  (Doc. 22.)

[6] In his amended complaint, Plaintiff raises a claim against the Individual Defendants under Section 1983 for a violation of his First Amendment right to freedom of speech.  Neither party mentions Count VI of the amended complaint, so it is unclear if this Count has continued vitality. However, Defendants' argument regarding the Individual Defendants' liability would be analyzed conterminously under both Counts V and VI.

## II.    <u>Legal Standard</u>

In considering a motion for summary judgment, a court may dismiss claims that do not present a "genuine dispute as to any material fact" and for which a jury trial would be an empty and unnecessary formality. Fed. R. Civ. P. 56(a). In order to prevail on a motion for summary judgment, the moving party must produce "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief. *Pappas v. City of Lebanon*, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The court must view the evidence "in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor." *Thomas v. Cumberland Cnty.*, 749 F.3d 217, 222 (3d Cir. 2014). This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the non-moving party on the claims. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-57 (1986).

Both parties must support their factual assertions by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c). Rule 56(e) allows the court to deem undisputed any fact not properly countered by record evidence. *See* Fed. R. Civ. P. 56(e)(2). The nonmoving party must then "go beyond the pleadings by way of affidavits, depositions . . . or the like in order to demonstrate specific material facts which give rise to a genuine issue." *Celotex*, 477 U.S. at 324.

In considering a motion for summary judgment, the court is not to engage in credibility determinations or the weighing of evidence. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992), *cert. denied* 507 U.S. 912 (1993). Instead, "[i]nferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Id.*

### III. <u>Discussion</u>

Defendants raise several arguments in support of their motion for summary judgment: (1) Plaintiff's equal protection claims fail due to lack of personal involvement by the Individual Defendants; (2) Plaintiff's claims are time-barred under the applicable statutes of limitations; (3) Plaintiff fails to demonstrate the complained-of conduct was so "severe or pervasive" as to create a hostile work or educational environment; and (4) Plaintiff fails to demonstrate that he was punished or discriminated against due to his disability. Defendants further argue that, if Plaintiff's equal protection claims fail, this court lacks supplemental jurisdiction over Plaintiff's state law claims. The court shall address each argument in turn.

#### A. Lack of Personal Involvement

Defendants first argue that they are entitled to summary judgment because Plaintiff has failed to demonstrate that the Individual Defendants had any direct involvement with the alleged discriminatory acts. The law is clear that a supervisor

cannot be held individually liable under Section 1983 for discriminatory acts carried out by their subordinates based solely on a theory of *respondeat superior*, *i.e.*, "solely on the basis of the existence of an employer-employee relationship." *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658 (1978); *Rizzo v. Goode*, 423 U.S. 362 (1976). Plaintiff, however, does not advance a theory of *respondeat superior* liability. Instead, Plaintiff argues that Defendants are liable because of their actions taken in a supervisory capacity. *See Santiago v. Warminster Twp.*, 629 F.3d 121, 129 (3d Cir. 2010) (distinguishing between *respondeat superior* and supervisory liability). In order to prevail in a Section 1983 claim sounding in supervisory liability, a plaintiff must demonstrate that the individual defendants personally participated in the alleged wrongs, directed others to do the alleged wrongs, or had knowledge of and acquiesced to the alleged wrongs. *Baker v. Monroe Twp.*, 50 F.3d 1186, 1190-91 (3d Cir. 1995). In Section 1983 claims, acquiescence means more than simply knowledge and inaction; the defendant must have direct supervisory authority over the employee. *Robinson v. Pittsburgh*, 120 F.3d 1286, 1294 (3d Cir. 1997), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006). "To establish knowledge and acquiescence of a subordinate's misconduct, a plaintiff must allege the defendant's (1) contemporaneous knowledge of the offending incident or knowledge of similar incidents in the past, and (2) actions or inactions which communicated approval of the subordinate's behavior."

*Broadwater v. Fow*, 945 F. Supp. 574, 588 (M.D. Pa. 2013). "A plaintiff may not allege that a supervisory defendant had constructive knowledge of a subordinate's unconstitutional conduct simply because of his role as a supervisor." *Id.* Although the standard requires the supervisory defendant to have actual knowledge of the misconduct, the knowledge may be inferred from the circumstances. *Baker*, 50 F.3d at 1190-91. Lastly, allegations of participation or actual knowledge and acquiescence must be made with appropriate particularity. *Boykins v. Ambridge Area Sch. Dist.*, 621 F.2d 75, 80 (3d Cir. 1980).

In his complaint, Plaintiff essentially raises two allegations of discriminatory conduct by the individual defendants: (1) failure to create or maintain a record of official complaints to campus police; and (2) failure to properly investigate and resolve said complaints. Plaintiff's claims most closely resemble a "failure to investigate" type of claim. *See Goldstein v. Pennsylvania*, No. 17-cv-3859, 2017 WL 4684333, *1 (E.D. Pa. Oct. 17, 2017) ("If [the plaintiff] is attempting to assert violations of her constitutional rights pursuant to 42 U.S.C. § 1983, based on [the d]efendants' failures to investigate crimes allegedly committed against her, these claims fail. '[A] private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another.'" (quoting *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973)). A plaintiff may, however, assert a valid failure to investigate claim if he demonstrates that "a reckless or intentional failure to investigate caused

a constitutional deprivation." *See Brock v. Allegheny Cty. Dist. Attorney Office*, 12-cv-0914, 2013 WL 3989452, *4 (W.D. Pa. Aug. 2, 2013) (citing *Eckman v. Lancaster City*, 742 F. Supp. 2d 638, 653–54 (E.D. Pa. 2010)). In contrast to *Brock*, Plaintiff has alleged that Defendants intentionally failed to investigate his claims against Estep and, in doing so, violated his constitutional right to equal protection by declining to investigate his claims because he identified as a gay male. At the summary judgment stage, however, the court must look beyond the mere pleadings to determine if Plaintiff has demonstrated sufficient evidence to raise a triable issue of fact. To so determine, the court must inquire into the respective duties and actions—or, here, inaction—by the Individual Defendants. The degree of responsibility and involvement of Halsted and Shegan differs and, thus, the court will analyze each Individual Defendant's liability in turn.

Dealing first with Plaintiff's claims against Halsted, the evidence presented by Plaintiff does not demonstrate the requisite personal involvement to support a claim against him. Plaintiff's argument is essentially that Halsted received notice in the form of an email regarding Plaintiff's complaints of harassment, and, thus, Halsted should have been on notice to investigate the claims or monitor the progress of the investigation by his subordinates. Halsted, however, was never tasked with supervising investigations of this nature or demonstrated any policy of following up on any individual investigation. At most, Halsted's responsibilities toward the

investigation would be ministerial. Halsted received a notice that a complaint was submitted, and he marked the notice as "confidential" due to the sensitive nature of the complaint, *i.e.* that it involved accusations of sexual harassment. (Halsted Dep., pp. 48-49.) Halsted placed the notice into his files and apparently took no further action regarding the criminal complaint.[7] (*Id.*) Plaintiff, however, has presented no evidence that Halsted would have followed up on any other complaint of a similar nature. As the university president, Halsted lacked the time and the resources to personally follow up on each and every investigation and, instead, entrusted such duties to campus police or other individual departments better suited to do so. Halsted responded to Plaintiff via letter dated May 6, 2004, expressing concern and referring him to Mansfield's chief human resources officer. (King Ex. 14.) Halsted acted consistent with his supervisory role by delegating the criminal investigation to campus police and referring the remaining issues raised by Plaintiff to human resources. Although Halsted, as Mansfield's president, is undoubtedly "superior" from an organizational standpoint to the campus officers who failed to properly record the complaint, Halsted does not have direct oversight of the officers which would impose liability under the standards set forth in *Baker*. Moreover, Halsted's

---

[7] Additionally, although Halsted had knowledge of the complaint, there is no evidence that he had actual knowledge of the failure to record or investigate Plaintiff's complaint. (Halstead Dep., pp. 59-61.) Thus, Plaintiff's claims against Halsted are limited solely to his failure to follow up on the disposition of Plaintiff's complaint.

"mere knowledge" falls far short of the "knowledge and acquiescence" to support supervisor liability under *Robinson*. Without any evidence that it was Halsted's standard practice to follow up on similar matters, there is no indication that Halsted was "actively involved in a cover-up" as argued by Plaintiff. (Doc. 40, p. 7.)

Shegan's duties and responsibilities with regard to the investigation, however, differ. As the chief of the campus police department, Shegan's oversight of the officers' conduct and her individual responsibilities are more direct than Halsted's. As chief of police, Shegan was tasked with ensuring that complaints were properly investigated, warrants obtained, and, if necessary, arrests made. (Shegan Dep. II, pp. 46, 69-70.) Shegan testified that the typical procedure for a walk-in complaint such as Plaintiff's would involve a commissioned officer creating a written statement from the complainant and investigating the complaint by, at a minimum, contacting the alleged assailant. (Shegan Dep. I, p. 41-47.) If the alleged assailant's statement differed, the police would then attempt to contact witnesses or obtain other evidence. (*Id.* at 46-48.) Notes of such investigations would be recorded and kept in a file specific to that complaint. (*Id.*) Plaintiff has failed to demonstrate that Shegan directed any subordinate not to record Plaintiff's complaint, not to investigate Plaintiff's complaint, or to treat Plaintiff's complaint differently in any way. However, Shegan may still be held liable if she had actual knowledge of her

subordinate's failure to record or investigate, and knowingly failed to act when it was within her authority to do so.

Shegan appeared to have actual knowledge of the complaint made by Plaintiff as evidenced by the letter to Halsted. (Doc. 47-1, p. 28.) There is also evidence that Shegan would have, in the normal course of processing such a claim, reported it to her immediate superior, Shari Clarke ("Clarke"), who was the Vice President of Student Affairs at Mansfield. (Clarke, ¶13 A, B.) Clarke, in her affidavit, stated that she was responsible for certifying all criminal statistical information provided by campus police to the Pennsylvania State Police, yet she was never notified of the complaint filed by Plaintiff. (Clarke at ¶13 D, E.) Based on this evidence, it appears that Shegan was notified of Plaintiff's complaint, had a duty to report and investigate that complaint, yet fell short of that duty.[8] Even if Shegan was unaware that the complaint was not recorded, she still failed to carry out the duties that she would normally perform after becoming aware of such allegations. (*Id.*)

There is support for the conclusion that this failure to investigate was an outlier within Mansfield's system. (*See* Shegan Dep. II, p. 49 (stating that Shegan would not normally reach out to Halsted regarding a criminal complaint, despite evidence that she did so here) and Shegan Dep. II, p. 69 (stating that Shegan has

---

[8] When asked "Isn't that your duty to see that there is a record," Shegan testified that: "It's the duty of the officer to properly enter a complaint, properly investigate an incident. And it's my duty to review that that's been done." (Shegan Dep. II, p. 49.)

never had an incident of a failure to record a criminal complaint).) Most troubling, however, is that Shegan felt the need to discuss the case with a human resources officer, yet appears to have completely ignored the matter after it was initially brought to her attention. Whether this was an administrative oversight or purposeful is unclear; however, it is reasonable to infer from Shegan's knowledge of the complaint and how she treated the complaint that she knew or should have known that it was not recorded per Mansfield policy. *See Baker*, 50 F.3d at 1190-91 (holding that knowledge of misconduct may be inferred from circumstances). Accordingly, Plaintiff has put forth sufficient evidence to create an issue of fact as to whether Shegan knew of and acquiesced to the failure to record Plaintiff's complaint.

Having shown sufficient evidence of Shegan's involvement, Plaintiff must still demonstrate a triable issue of fact as to whether Shegan's conduct was discriminatory. A review of the evidence presented demonstrates that Plaintiff has presented no direct evidence of discriminatory purpose; however, discrimination can be demonstrated by both direct and circumstantial evidence. *Jackson v. Univ. of Pittsburgh*, 826 F.2d 230, 236 (3d Cir. 1987) ("In today's climate of public opinion, blatant acts of discrimination—the true "smoking guns"—can easily be identified, quickly condemned and often rectified in the particular settings where they occur. Much of the discrimination that remains resists legal attack exactly because it is so

difficult to prove. . . . That is one of the reasons why our legal system permits discrimination plaintiffs to prove their cases by direct *or circumstantial* evidence." (emphasis in original) (quotation omitted).)

In sum, Plaintiff has presented evidence that: (1) he complained of sexual harassment by a Mansfield employee (2) the complaint was not properly recorded or investigated pursuant to Mansfield policy; (3) Shegan was aware of Plainitiff's complaint and reported it to human resources; (4) the complaint was not properly reported to Clarke; and (5) Shegan had never encountered another incident where such a reporting oversight occurred. Moreover, despite reporting the complaint to human resources, Shegan never felt it necessary to follow up on the complaint or apparently even refer to it at any point that would have led to the discovery of the fact that it was improperly recorded. Similarly, although Shegan does not appear to actually conduct investigations into complaints, she has oversight responsibility in managing the investigations of her subordinates. Again, it appears unusual that she would have regarded this complaint as significant, yet felt no need to even confirm that the investigation had begun.

"Evidence of procedural irregularities such as these may raise an inference of discriminatory intent. However, there must be some evidence that the irregularities were related to plaintiffs' [protected class]." *Blunt v. Lower Merion Sch. Dist.*, 826 F. Supp. 2d 749, 760 (E.D. Pa. 2011), *aff'd*, 767 F.3d 247 (3d Cir. 2014) (citing *Stern*

*v. Trustees of Columbia Univ.*, 131 F.3d 305, 313 (2d Cir. 1997); *E.E.O.C. v. Muhlenberg Coll.*, 131 Fed. App'x 807, 812 (3d Cir. 2005); *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999)). As argued by Plaintiff, the procedural irregularities and oversights in this case resulted in a denial of protections afforded to other students who experienced similar instances of sexual assault. Although Defendants state that they are without sufficient information to confirm the allegation, Plaintiff alleged that he reviewed police records obtained during discovery in *Mansfield I* and confirmed that similar complaints made by female students were properly recorded. (Doc. 27, ¶ 90.) Plaintiff has not yet produced these records and, of course, if a complaint were not recorded, it would not be apparent from such records. Shegan, however, stated that this was the sole instance that she knew of where a complaint was not properly investigated. (Shegan Dep. II, p. 69.) Viewing this evidence in the light most favorable to the nonmoving party, as this court must do, the totality of the evidence could give rise to an inference that Shegan's failure to investigate and ensure proper recordation and reporting of Plaintiff's complaint was based upon his protected class. *Pollock v. Am. Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986). Accordingly, Defendants motion for

summary judgment will be denied with respect to the equal protection claim against Shegan.[9]

## B. Statute of Limitations and Equitable Tolling

Defendants next argue that Plaintiff's claims under the PHRA and the PFEOA are time barred to the extent that they relate to the harassment by Estep. Count I of Plaintiff's complaint asserts a claim under the PHRA based on a claim of harassment and hostile work environment due to Plaintiff's sex, while Count II asserts a claim under the PFEOA based on the same facts, but claiming a hostile educational environment. Both counts relate to the university's failure to prevent Estep's abusive conduct whether in the context of Plaintiff's employment or status as a student.

A federal court must apply state law in ascertaining whether a state statute of limitations has been tolled. *Boyle v. City of Phila.*, No. 17-cv-262, 2018 WL 994218, *5 (E.D. Pa. Feb. 20, 2018) (citing *Vernau v. Vic's Market, Inc.*, 896 F.2d 43, 45 (3d Cir. 1990)). Both the PHRA and the PFEOA require a plaintiff to bring a complaint before the Pennsylvania Human Relations Commission ("PHRC") within 180 days

---

[9] Because the court has not dismissed all of Plaintiff's federal claims, it need not address Defendants' argument that the court should exercise its discretion to dismiss Plaintiff's supplemental state law claims. (Doc. 40, pp. 8-9 (citing 28 U.S.C. § 1367(c)(3); *Hedges v. Musco*, 204 F.3d 109, 123 (3d Cir. 2000) ("the district court must decline to decide the pendent state law claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so.")).)

of the alleged act. 43 Pa. C.S. § 959(h); 24 Pa. C.S. § 5007; *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002) (finding that a plaintiff could only file charges covering "discrete acts that 'occurred' within the appropriate time period"). "Each discrete discriminatory act starts a new clock for filing charges alleging that act." *Morgan*, 536 U.S. at 112. Discrete acts, such as "termination, failure to promote, denial of transfer, or refusal to hire" are easily identifiable, and those that are untimely are not actionable. *Id.* at 115. However, such time barred acts can be used as "background evidence" to support a timely claim. *Id.* at 112.

Plaintiff does not contest the basic fact that he filed his complaint with the PHRC long after the 180-day limit. Plaintiff, however, citing *Crouse v. Cyclops Industries*, 745 A.2d 606, 608 (Pa. 2000), argues that an issue of fact exists as to whether the statute of limitations has run and, thus, summary judgment is improper. Specifically, he argues that the text of the law provides that the statute of limitations provision should be "construed liberally," and, thus, he should be excused from his late filing because his injury could not have been discovered through reasonable diligence.[10] 43 Pa. C.S. § 1962(a). In support of this argument, Plaintiff explains at length the childhood trauma he experienced that contributed to his depression and allegedly inhibited him from realizing the impact that Estep's abuse had on his

---

[10] Reasonable diligence is defined here as "a reasonable effort to discover the cause of an injury under the facts and circumstances present in the case." *Crouse*, 745 A.2d at 612.

mental health and asserts that his "diminished mental capabilities" precluded him from "claiming the protection of the statute of limitations." (Doc. 47, p. 23-24.) Although Plaintiff's position is a sympathetic one, and Estep's treatment of him during his time as a student is abhorrent, Plaintiff's argument that the statute of limitations should be tolled is unsupported by the law.

Plaintiff asserts that a decision from the Eastern District, which was affirmed by the Third Circuit without opinion, supports a denial of summary judgment: *Greenberg v. McCabe*, 453 F. Supp. 765 (E.D. Pa. 1978), *aff'd*, 594 F.2d 854 (3d Cir. 1979). Plaintiff's reliance on *Greenberg* is misplaced as the facts there are readily distinguishable from the instant case. In *Greenberg*, a plaintiff brought a malpractice suit against her psychiatrist because she suffered psychiatric harm stemming from the defendant's "treatment" which involved a sexual relationship between the plaintiff and the defendant and numerous prescriptions for unwarranted medications. The court found that there was a legitimate issue of material fact which must be decided by a jury as to whether "the plaintiff knew or in the exercise of reasonable diligence should have known that the defendant's conduct was causing her harm." *Id.* at 767. *Greenberg* is factually distinguishable from Plaintiff's situation. The psychiatrist-defendant used his position and influence to obscure the fact that he was committing malpractice and sexually abusing the plaintiff under the guise of "treatment." Put simply, Greenberg did not understand that she was being

abused rather than treated until much later than the end of the doctor-patient relationship. The case *sub judice* is more akin to a comparatively recent decision by the Third Circuit, *Hartz v. Diocese of Greensburg*, 94 F. App'x 52, 55 (3d Cir. 2004). In that case, twenty years after the abuse occurred a former Catholic school student sued the Diocese and his former teachers who were members of the clergy for alleged sexual abuse that occurred during his time as a student. The court acknowledged the plaintiff's argument that he was too young to understand the abuse and was often under the influence of drugs or alcohol when the abuse occurred. The Third Circuit, however, distinguished between *Hartz* and *Greenberg*, noting that the plaintiff in *Hartz*, even as a child, was aware that the abuse that was occurring was wrong: "Hartz concedes in his Amended Complaint that, on several occasions after awaking from an alcoholic stupor, he asked Father Premoshis if illegal sexual activities were taking place. By making this concession, Hartz dooms his tolling argument." *Id.* at 55 (internal record citation omitted) (citing *E.J.M. v. Archdiocese of Phila.*, 622 A.2d 1388, 1395 (Pa. Super. 1993) (refusing to toll the statute of limitations despite alleged fraudulent concealment by the accused when "the plaintiff's own common sense should inform him that he has been injured")). Here, Plaintiff obviously knew that Estep's abusive conduct was wrong and made clear efforts to avoid being present with him, repel his advances, and complained informally. In contrast to the patient-plaintiff in *Greenberg*, Plaintiff saw the abuse

for what it was while it was occurring and thus was required to raise his claims within 180 days from the last act of abuse, which could have occurred no later than May 2, 2003, the date of Estep's retirement.[11]  Plaintiff did not file his complaint with the PHRC until September 15, 2004, well over a year later.  Accordingly, because Plaintiff has put forth no legitimate issue of fact as to the applicability of the statute of limitations, the court must dismiss his claims under the PHRA and the PFEOA insofar as they relate to Estep's conduct.

## C.  Disability Discrimination

Defendants argue that Count III should be dismissed because Plaintiff fails to produce evidence demonstrating that either of his professors or Mansfield itself failed to accommodate his disability.  In pertinent part, the PFEOA provides that: "it shall be an unfair educational practice for an educational institution [t]o exclude

---

[11] Plaintiff relies heavily on his psychiatric expert evaluations which state that he was an "egg shell plaintiff."  (Doc 47, p. 15.)  The experts seemed to conclude that the mistreatment by Estep exacerbated his childhood trauma and caused his current depression and other psychiatric issues.  (*Id.* at 15-18.)  Plaintiff's predisposition to psychiatric harm is irrelevant to the issue of tolling the statute of limitations.  The discovery rule focuses on a plaintiff's ability to perceive that harm has occurred and is disparate from a plaintiff's cognizance to seek legal recourse.  Plaintiff cites no case law to support such a claim that a plaintiff's mental difficulty in seeking legal help results in tolling, and cases such as *Hertz* seem to flatly reject such a proposition.  *See also Harris v. Phila. Protectory for Boys,* No. 17-cv-2874, 2018 WL 1123766, *1 (E.D. Pa. Mar. 1, 2018) ("under Pennsylvania law, although the discovery rule is equitable in nature, the test for its application is an objective one which cannot depend on any characteristic that is unique to an individual plaintiff") (citing *Dalrymple v. Brown*, 549 Pa. 217, 701 A.2d 164 (1997) (plaintiff there contended that she had suffered sexual abuse as a child, but did not recover a memory of the events until approximately 20 years later)).

or limit, or otherwise discriminate, because of . . . handicap or disability, against any student." 24 P.S. § 5004(a)(1). "When a plaintiff alleges a discrimination-based claim under the PFEOA, he must first establish a prima facie case of discrimination in regard to the adverse action he experienced . . . A plaintiff's [protected] status and adverse action do not alone raise the required inference of discrimination. *Lei Ke v. Drexel Univ.*, No. 11-cv-6708, 2013 WL 1092661, *8-9 (E.D. Pa. Mar. 14, 2013) (citing *Manning v. Temple Univ.,* 157 F. App'x 509, 513 (3d Cir. 2005) (requiring inference of discrimination as to plaintiff's dismissal before reaching specific elements of education discrimination claim under PFEOA)).

Defendant argues that Plaintiff abandoned his claims under the PFEOA because he failed to substantively respond to Defendant's motion for summary judgment on these issues;[12] however, even if the court considered Plaintiff's claims on the merits, they nonetheless fail for want of a *prima facie* showing of

---

[12] *See Whitaker v. Springettsbury Twp.*, No. 08-cv-627, 2010 WL 1565453, 15 (M.D. Pa. Apr. 19, 2010), report and recommendation adopted, 08-cv-627, 2010 WL 2302295 (M.D. Pa. June 7, 2010) ("Plaintiffs have not responded to this argument in their opposition brief . . . Indeed, a [p]laintiff's failure to respond to these arguments constitutes an abandonment of these causes of action and essentially acts as a waiver of these issues.") (citations omitted).

Counts III and IV of Plaintiff's complaint refer predominantly to Drs. Carpenter and Gaballa's treatment of Plaintiff while he was enrolled in their courses and his subsequent failing grades in those complaints. Plaintiff argues that it was not Drs. Carpenter and Gaballa's conduct alone that results in liability under the PFEOA, but, rather, the school and the administration's failure to correct their conduct. (Doc. 27, ¶¶ 76-8.) The court need not consider whether Plaintiff properly raised his claim against Mansfield because, assuming *arguendo* that Plaintiff properly raised this claim and did not waive it in his response to Defendants' motion for summary judgment, Plaintiff's complaint fails on the merits.

discriminatory intent. In the spring semester of 2004, Plaintiff enrolled in a "Business Policy" course taught by Dr. Gaballa and a "Money and Banking" course taught by Dr. Carpenter. (King Dep. II, p. 155; Ex. 8). Plaintiff failed both courses (King Ex. 8), despite being allowed to make up coursework that he missed due to his depression-related absences. (King Dep. II, p. 58-59; 112-13). Plaintiff argues that Drs. Carpenter and Gaballa declined to allow him to make up classes or assignments or alter his grade because of his depression and that he complained to the administration that their conduct was discriminatory, yet the university administration took no steps to correct their conduct. Although Plaintiff has produced evidence, and Defendants do not contest, that Plaintiff wrote letters to Halsted as well as several state and federal legislators, and Bailey was aware of his academic complaints, Plaintiff has failed to produce any evidence that his professors' underlying conduct was discriminatory.

Plaintiff has adduced no evidence that either professor was aware that his depression was the cause of his absences,[13] nor that they treated him any differently than any other student who missed the number of assignments and classes that

---

[13] None of the doctors' notes submitted by Plaintiff mentions depression. He once complained of flu symptoms and presented a note that stated he was seeing the doctor for a "medical followup" and was "reputedly sick since last Wednesday." (King Dep. II, Ex. 18.) The only notice that Plaintiff may have suffered from a mental health issue was a note stating that his absence was due to "emotional distress." (*Id.*) Other than this single note, there is no indication that Defendants were aware that Plaintiff was missing class due to a disability until after his grades were assigned.

Plaintiff missed. Plaintiff did not appear to seek accommodations for his disability until after he already received a failing grade in the classes. Only then did he seek to have his grades changed. A hearing was held on Plaintiff's request for a grade change, but Plaintiff did not attend the hearing. (Carpenter Dep. Ex. 1; King Dep. II, p. 154-55; Ex. 24 (notifying Plaintiff of date and time of hearing)). As a result of the hearing, the requested grade change was denied. (Carpenter Dep. Ex. 1; King Dep. II, p. 155; Ex. 24). There is no evidence, aside from the vague doctors' notes presented by Plaintiff, that he sought an accommodation for a disability, and Plaintiff does not explain what accommodation he sought or how any accommodation would have benefitted him. The result of his depression was that he was unable to attend class or complete assignments. He did not seek to withdraw from the classes or seek special assistance to compensate for his disability in class. He did not appear at the hearing convened to hear his appeal for an incomplete grade and Mansfield had no additional information that it could have used to justify excusing his absences and failing assignment grades.

Even if Plaintiff were to show that Drs. Carpenter and Gaballa exhibited some discriminatory intent, they are not parties to this suit and there is no indication that this intent was imparted to the administration or that the administration *also* discriminated against him because it failed to accommodate his request. Indeed, Halsted referred the matter to human resources and a hearing was held on Plaintiff's

official complaint. (Carpenter Dep. Ex. 1; King Dep. II, p. 155, Ex. 24). Plaintiff has presented no evidence that his complaint was treated differently or negatively in any way compared to similar complaints, nor has he noted any conduct that would lead to an inference that his request was denied or not addressed due to his disability. Accordingly, Plaintiff has presented no evidence that either his individual professors or the school itself discriminated against him due to his disability. Therefore, the court will grant Defendants' request for summary judgment with respect to Count III.

### D. Hostile Work/Educational Environment

Defendants next argue that Plaintiff has failed to establish that he can succeed on a hostile work/educational environment claim because he has failed to demonstrate that the conduct was sufficiently "severe and pervasive" to constitute a hostile work environment. To succeed on a hostile work environment claim, a plaintiff must establish that: 1) he suffered intentional discrimination because of his membership in a protected class; 2) the discrimination was pervasive and regular; 3) the discrimination detrimentally affected him; 4) the discrimination would have detrimentally affected a reasonable person in like circumstances; and 5) there is a basis for holding the employer vicariously liable. *Tourtellotte v. Eli Lilly & Co.*, No. 09-cv-774, 2013 WL 1628606, *5 (E.D. Pa. Apr. 16, 2013), *aff'd*, 636 F. App'x 831 (3d Cir. 2016) (citing *Huston v. Procter & Gamble Paper Prods. Corp.*, 568 F.3d

100, 104 (3d Cir. 2009)); *see also Simpson v. Kay Jewelers*, 142 F. 3d 639, 643-44 n.4 (3d Cir. 1998) (holding that discrimination claims are analyzed similarly under both Title VII and the PHRA).

Because this court has dismissed Plaintiff's claims under the PHRA and PFEOA as it relates to Estep's abusive conduct, the court need only consider Plaintiff's claim that the conduct of Drs. Gaballa and Carpenter created a hostile educational environment. Defendants argue only that Plaintiff has failed to establish that Drs. Gaballa and Carpenters' conduct was so severe, pervasive, and objectively offensive under the law that it established a hostile work environment. The test for whether conduct was sufficiently "severe and pervasive" to establish a prima facie case for a hostile work environment is a balancing test and does not require a specific number of events over a specified span of time. "The 'severe or pervasive' standard is disjunctive and so 'a plaintiff need not show that [his] hostile working environment was both severe and pervasive; only that it was sufficiently severe or sufficiently pervasive, or a sufficient combination of these elements, to have altered [his] working conditions.'" *Middlebrooks v. Teva Pharm. USA, Inc.*, No. 17-cv-412, 2019 WL 438092, *8 (E.D. Pa. Feb. 4, 2019) (*quoting Moody v. Atl. City Bd. of Educ.*, 870 F.3d 206, 214 n.12 (3d Cir. 2017).) "Factors we must look at include 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it

unreasonably interferes with an employee's work performance.'" *Durand v. FedEx*, No. 12-cv-7450, 2015 WL 140215, *7 (D.N.J. Jan. 12, 2015) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). A hostile work environment consists of more than "offhand comments and isolated incidents." *Carver v. City of Trenton*, 420 F.3d 243, 262-63 (3d Cir. 2005). Rather, "the conduct must be extreme to amount to a change in the terms and conditions of employment." *Id.* at 262.

Limiting its analysis to conduct committed by Drs. Carpenter and Gaballa, the court must dismiss Plaintiff's hostile work/educational environment claims. Even assuming the veracity of Plaintiff's claims, the most egregious conduct he can point to is Dr. Carpenter "treating [Plaintiff] in a rude and hostile manner" and Dr. Gaballa being "rude" to Plaintiff and "kicking Plaintiff out of his class." (Doc. 27, ¶¶ 71-72.) As previously stated, Plaintiff has failed to demonstrate that Drs. Carpenter and Gaballa gave him failing grades or declined to excuse his absences for discriminatory or otherwise improper purposes.

Without more, the alleged rudeness by his professors amounts to, at most, "the mere utterance of an epithet, joke, or inappropriate taunt that may cause offense" which "does not sufficiently affect the conditions of employment to implicate . . . liability." *Miller v. Thomas Jefferson Univ. Hosp.*, 565 F. App'x 88, 93-94 (3d Cir. 2014); *see also Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) ("[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will

not amount to discriminatory changes in the terms and conditions of employment."). Because Plaintiff has proffered no evidence of hostile conduct by his professors and alleges no more than mere offensive utterances, he cannot sustain a hostile educational environment claim based on their conduct and, thus, summary judgment on Count IV is appropriate.

## IV.    Conclusion

For the foregoing reasons, the court finds that Plaintiff has failed to adduce evidence that Halsted was sufficiently personally involved to impose liability under Section 1983; however, Plaintiff has proffered evidence that creates a triable issue of fact as to whether Shegan was sufficiently involved in the failure to record and investigate Plaintiff's criminal complaint against Estep.  Thus, the motion for summary judgment is granted with respect to the claims against Halsted and denied with respect to the claims against Shegan.  Further, because Plaintiff's claims are time-barred as they relate to Estep's abuse and Plaintiff has failed to present evidence of abusive or discriminatory conduct by his professors, Defendants' motion for summary judgment is granted with respect to Counts I through IV.

s/Sylvia H. Rambo_____
SYLVIA H. RAMBO
United States District Judge

Dated: February 28, 2019